GREEN MARTIN, plaintiff in error, vs. THE STATE OF GEOR-
GIA, defendant in error.

[1.] When two persons are indicted together, and a true bill found against both, but one only is arrested, arraigned, and put upon his trial, a general verdict, "We the jury find the *defendant* guilty," is sufficiently certain as to the individual intended.

[2.] A juror who, while consulting with his fellow-jurors in a criminal case, refers to another offence, alleged to have been committed by the defendant, saying "he is a bad man any how," and especially if he acknowledges that this other imputed crime influenced the jury in convicting the accused, evinces a bias of mind that disqualifies him from serving as a juror.

Murder, from Washington county.    Decided by Judge
HOLT, March Term, 1858.

Green Martin was indicted for murder of his negro.
Upon the trial the following evidence was adduced:
*Dr. Lucien Q. Tucker* being sworn:  I am a physician;
I was practicing on the 9th day of May, 1857; I was requested by Mr. Martin to examine the negro boy; this was on the 11th May, 1857.  I examined; Green Martin asked himself;
I found the boy disfigured by bruises; I had no instruments;
I did not probe the wounds; the bruises were on his breast, sides, wrists, and ankles, and his face;  I borrowed a pocket knife and cut into the boy's neck, and found a dislocation of his neck; his name was Alfred; he was the property of Green Martin;  was taken out of the grave; I suppose a dislocation of the neck caused his death; bruises were severe, and on the side the skin was broken, produced by violence;
they were caused by something hard; the appearance of the bruises around the wrists and ankles were caused by a rope;
the bone upon which the head rests is called the atlas; it was dislocated; a fall will produce dislocation; the fall must be violent; a fall backwards from a chair has produced it; a jerk may produce it; choking without a jerk will not; the boy was disinterred; does not know how long the boy was buried; judging from the wounds, they appeared to

have been of recent date; suppose the boy's neck had been dislocated; he found that, and knew it was sufficient; the boy was buried in an old field belonging to Thomas Wright, of Washington county, about one mile and a half from the residence of the defendant; the dislocation of the atlas causes death by pushing forward, and presses upon the wind-pipe, and causes suffocation; appeared of recent date— of few days.

*Cross.*—I was called for a *post mortem* examination; I found him at the grave; the grave yard was a negro grave yard; I saw other graves there; I can't tell how many places the skin was broken in exactly; I remember two, I found one in his side; the body was swollen very little; I can't tell the depth of the bruises from external appearances; the one on the side was cut through the skin; after a dislocation of the neck on the ground, the person could not rise again; witness thinks pushing the bone forward would produce strangling; the witness says that a dislocation of the neck caused the death of the boy.   I cannot say that the bruises produced the death; the witness says that the grave did not present the appearance of concealment; he says Mr. Martin asked him to go and examine the boy; it was at the Coroner's request; some person was with Mr. Martin when he asked him, but he does not remember who; the dislocation of the atlas will cut off all connection between the body and brain; all action afterwards would be but spasmodic—death would instantly ensue.

Miss Catharine Martin sworn and says:   I am the daughter of Green Martin; I reside at my father's house in the county of Washington; I have resided at home, my father's, ever since the 9th of May, 1857.   My father is the owner of slaves; he owned a negro boy by the name of Alfred; the boy is dead.   He died on the 9th of May, 1857, at my father's house in the county of Washington, State of Georgia. My father, two sisters, and my brother Godfry and myself were present.   My brother Godfry is not present in the coun-

ty. I don't know where he is; I have seen him once since the 9th of May, 1857, on Sunday night week afterwards. Alfred was over twelve years of age at his death; does not know how much over, but between twelve and thirteen. Was in good health up to that time as far as she knew. He was struck three licks with a rope by Godfry about three o'clock P. M. I saw my father choke him about twelve o'clock, no one present but myself. He then threw him on the ground and sat down on him astraddle of him. Short time after he then choked him and threw him down the second time again; my brother Godfry then poured water on him. My father then got off of him, and did not trouble him any more. My father did not sit down on him the second time. I saw my brother Godfry kick him down. The boy then again got up. I have been sworn twice on this case; once by Mr. Daniel at the Coroner's inquest, next time at Dr. McBride's; John Ivy, Henry Wood, Silas Daniel were the Justices. There was a saddle used by Godfry on that occasion; the saddle was put on the negro, my father was sitting present as close as to you (Hook) [distance about 20 feet.] About one half hour after, my father choked the boy down the second time, until my brother Godfry put the saddle on him; the witness did not see the boy during the time; she was in the house, the boy was on his all fours. My brother put the saddle on him and then got upon it; he remained some quarter of an hour, I suppose; he sat upon the boy, but did not make him carry him. My father was present. After the riding the boy carried the saddle into the house by the order of my father, and then returned to the yard. When the boy returned to the yard, I saw my brother Godfry kick him down; my father was sitting on the bed scaffold in the yard, seven or eight feet from my brother. It was between three and four o'clock. One hour before the boy's death, after the boy was kicked down, and he got up and my brother slapped him down, but did not see him or my father strike him with a stick. Witness does not know

what followed immediately. Witness did not see the boy dragged by a rope; he was hit three licks with a rope by her brother. It has been nearly a year since I testified before the Justices, but do not remember testifying to the fact that there was a rope around his body; does not remember seeing a rope around his body one-quarter of an hour before his death. The whipping commenced about twelve o'clock, while my father was sitting on the boy. Did not see him choke him nor strike him. I saw him dead about an hour by sun, near six o'clock. Did not go to the boy, but saw him while passing; he was naked, but she does not know who stripped him. My father did not carry him to the house, but my brother carried him to his mother's house and laid him out. I saw him next morning in his mother's house, but did not examine him. My father and brother did not bury him secretly; they did not request him to be buried secretly. I do not remember to have said that with a rope around his waist he dragged him fifty yards. I came to town with my two sisters and Washington Gilbert on last Wednesday; I have stayed at Mr. Langmade's ever since. I was over twenty years at the time this occurred. Witness saw the boy next morning after his death; she saw no bruises before his death, nor when he was lying in the yard dead. Witness does not remember that her father and brother requested that the boy should be buried secretly, nor any intimation that way. The body was swollen considerably next morning. The boy was buried on the 10th of May, near sunset. Witness, two sisters, James L. Scott, one cousin, and William Dent, and several negroes. My father did not attend, in consequence of sickness; he was vomiting. No one attempted to interfere during the events which she has testified. Her mother was not living. She and her sisters were there, but did not bother them for fear they might bother her.

*Cross.*—The slaves of Green Martin were not particularly under control of her brother; they all worked together.

Godfry Martin worked in the field during that year; this boy was one of the hands. Godfry Martin controlled them while in the field. Witness testified that on that day she did not hear the cause of this correction. The cause of the whipping was because he sauced her brother. The boy told brother to kiss his backside; the boy said that he said so. The boy was very saucy and uncontrollable. Her father did not remain long on the boy—one or two minutes. Her father did not appear angry while sitting upon the boy. He used no uncommon violence during the affair. The boy did not complain after he got up. She saw her father sit down on the boy between one and two o'clock; never saw her father touch the boy afterwards. Witness did not hear the boy complain from any injury he had received from Green Martin.

*By the State, re-examined.*—Witness heard her father and Godfry say at that time, that the offensive words recorded above, was the reason for whipping him. Witness says she does not know whether the whipping a week before was for this offensive language or not. Witness says that the boy was kindly treated, and was a pet negro.

*Miss Mary Martin* sworn and says: That she is the daughter of Green Martin. She is unmarried, and she lives at her father's, and she lived there on the 9th May, 1857. Her father owned slaves, owned a boy by the name of Alfred. He was thirteen or fourteen years old at that time. Between twelve and one o'clock the affray commenced. I saw my father throw Alfred down; then he choked him whilst he was down. I saw my father throw him down twice and choke him twice. He did not choke him long; five minutes between the choking; the choking did not choke him five minutes. I did mean astraddle the boy. I did not see a saddle on him. I was in the house. My sisters were in the house. I was in the sitting room. I was in the piazza when I saw my father choke Alfred. The piazza is on the back part of the house. When I was in the piazza my sisters were in the room I had just left. I could have seen what

was going on if I had looked. The boy died about four o'clock in the evening. I saw him after he was dead, about one hour by sun; he was not stripped; he did not look swollen until next day. Does not know whether he looked swelled all over or not. I saw no rope used that day. I saw the boy dragged by brother over the yard by the hand. I did not see my father drag him; my father was present. I did not see the saddle. I saw my brother carry the saddle out and Alfred bring it back. He did not look tired, nor was he weeping as she knows. The boy was lying at the end of the wheat house when she saw him. Godfry put him there, he was dead; he remained half hour. My father was then in the house; Godfrey was in the house part of the time. I saw them attempt to give him mustard, but they could not get it down him. Father got the mustard out of the house; witness gave it to him. Her father did not try to do anything for him. Godfry carried him from the wheat house in his arms. She did not see him drag the boy. My father told the witness to get the mustard for Godfry after he came into the house. Witness says that the boy was behind the wheat house, and that Godfry brought him from that place in front. My father was in the house; does not know how long her father had been in the house before Godfry gave him the mustard. The boy was well at twelve o'clock. Does not know how long. Passed frequently from the yard into the house. She did not interfere; was not particularly afraid of either.

*Miss Sarah Martin.*—Witness says that she is the daughter of Green Martin. She resides at her father's; she resided there May 9th, 1857. She was in her sixteenth year at that time. Her father had a boy by the name of Alfred. She saw him about 11 o'clock; he was in the yard. He was toting water from the spring, which is one-quarter of a mile from the house. She saw Alfred about two or three o'clock; he was alive, father was sitting on him, and brother was pouring water on him part of the time. She did not

hear him beg for mercy. She was in twenty yards of him. He sat on him about half minute. She did not see her father lying on him as she recollects. She did not see him lying across the middle of the boy. She has testified in this case once at Dr. McBride's, and again at the inquest. She saw a stick used like unto a quilting frame by brother; Godfry used the stick. Father was in a yard or two, does not know whether he, father, was looking or not. The boy had on a shirt; the shirt remained one-half hour on the boy, She did not see a saddle on the boy. Was in the room sick. did not pester either because she did not want; knew she was not able to do any good, was sorter afraid of them. Her father said in the kitchen: "Damn him, if he was a mind to lay there and die, let him die." The boy was lying at one end of the wheat house. My brother pushed him down with the stick. He, father, and brother were not raving and cursing at that time; they acted as they usually did. Did not always whip their negroes that way; was not in a riotous manner. After the boy had been pushed down with the stick, he got up, and Godfry kicked him down. The punishment continued three hours; the punishment was continually kept up until the boy's death. She saw him choked once. Godfry and father eat dinner at twelve, commenced whipping after dinner. The boy died about one and half hour before supper. He, father, did not eat any supper, nor Godfry; but she did; they were notified supper was ready. She saw her father choke him once.

*Cross.*—She did not see her father do anything to the boy after he choked him. The boy looked like he was tired previous to being pushed down; the pushing took place at the wheat house near a post. The ground was tolerable smooth, had not been dug out. Godfey kicked the boy down in the same place that he pushed him down. The boy did not get up after he was kicked down as she knows of.

*John A. Bedgood* testifies as follows: I was at Mr. Green Martin's about twelve o'clock on the 9th of May, 1857. I

was at work there. I saw Green Martin on Alfred's back after dinner; Alfred had his clothes on. I left soon to work. Green Martin was choking Alfred while sitting on him; he could not halloo. Godfry Martin was pouring water on the back part of his head and neck. Mr. Green Martin said it was for the purpose. Witness was frightened, and went off to Pricy Martin's to hair some hides. Came back one-half hour by sun; the boy was lying in the yard on his face, naked and dead. The boy looked badly bruised; bruised all over, was bruised on both sides, on his back, breast, face, neck; and his legs were bruised some. The boy was not swollen, looked bruised and scratched up about the neck. Green Martin was in the house when he returned. This happened in the county of Washington, State of Georgia. His body was about ten steps from the place where he saw him in the morning.

*Cross.*—I am fifteen years old. I live at James Northington's. Smith brought me to town. Witness has testified before in this case. Green Martin said, pour it on his head to keep him from fainting. Folks have talked to me about swearing in the case. I was told to swear the same this time that I swore before Mr. Jordan Smith; Alexander Orr told me to do so. I did not see the boy run and tell Godfry Martin to kiss behind. Witness says he did not say, at the Coroner's inquest, that he saw the boy Alfred run and slap his behind and tell Godfry to kiss it, as he now recollects. Witness does not know how long Mr. Martin lay upon the boy; he left. When he returned he did not go near the boy; he was frightened. Witness did not go in thirty yards of the boy.

*By the State.*—Witness says that he did not go near the boy that evening; he saw the bruises next morning. He says his face was bruised.

*Alexander Orr, Coroner,* sworn: Says he was the Coroner at the inquest of the boy Alfred on the 11th May, 1857. I received the information from Mr. Thomas Wright, and

Martin vs. The State.

Jordan Smith, John Anderson, and Gordon Waters; all the gentlemen were living in that neighborhood. He sent Gordon Waters after Dr. Parsons, and then he sent him after Dr. Tucker, who was at the widow Martin's. While he was gone, the prosecutor said that he must get Dr. Parsons. He went after Dr. Parsons himself, but failed to get him.

When the testimony and argument had concluded, the counsel of Green Martin, among other requests, desired his Honor Judge Holt, to charge the jury as follows, in the language of the request, viz:

That if the jury, from the testimony in this case, believe Green Martin was present when Alfred was kicked and pushed down by Godfry Martin, but took no part in kicking or pushing him down with a stick, or striking him with a rope, nor endeavored to prevent these Acts by Godfry, nor apprehended Godfry after he did these acts, and the negro Alfred was dead; this conduct, though highly criminal in Green Martin in itself, will not of itself render Green Martin guilty, either as principal or accessory. Which his Honor declined to do.

The plaintiff in error alleges, that in the argument before and to the jury, the Attorney General and James S. Hook, Esq , associate counsel of the State in the prosecution, each, during their speeches, said distinctly and emphatically that the defendant, Green Martin, rode the boy Alfred as a horse, and that they did so without being arrested or checked by the Court for stating that as a fact which was not in testimony.

The jury charged with the indictment aforesaid against Green Martin and Godfry Martin, returned into Court on the morning of the fourteenth day of March, 1858, with a verdict, which was handed to the Clerk and read by him as follows: We, the jury, find the defendant guilty. Which the counsel for Green Martin desired, when recorded, to be recorded as written. But his Honor the Judge, contrary to the

protest of counsel, directed the jury to amend it by inserting the name of Green Martin.

The counsel of defendant, Green Martin, moved his Honor, Judge Holt, for a new trial on the following grounds, to-wit:

1st. That the jury found the defendant, Green Martin, guilty contrary to law.

2d. That the jury found the defendant, Green Martin, guilty contrary to evidence, and without evidence.

3d. That the jury found the defendant, Green Martin, guilty contrary to the weight of evidence.

4th. That the counsel for the State argued to the jury that the defendant, Green Martin, *rode* the boy Alfred as a horse, and thereby asserted as a fact that which was not in testimony, and thereby greatly colored the acts testified to of said Green Martin having straddled the boy, and impressed, by such statements and argument, the jury with the idea of excessive cruelty having been used by Green Martin in the punishment of his slave Alfred.

5th. That the Court erred in not giving in charge to the jury, as he was desired, the following request: That if the jury, from the testimony in this case, believe Green Martin was present when Alfred was kicked and pushed down by Godfry Martin, but took no part in kicking or pushing him down with a stick, or striking him with a rope, nor endeavored to prevent these acts by Godfry, nor apprehended Godfry after he did these acts, and the negro Alfred was dead, this conduct, though highly criminal in Green Martin in itself, will not of itself render Green Martin guilty either as principal or accessory.

6th. That the jury returned into the Court on the 14th day of March, 1858, with their verdict, and being delivered to the Clerk, was read publicly as follows by him; We, the jury, find the defendant guilty. Which verdict his Honor the Judge directed the jury to amend by inserting the name of Green Martin, contrary to the protest of counsel of said

Green Martin, on the ground stated by them, that as the indictment in the case was against Green Martin and Godfry Martin, the verdict as published was indefinite as to the person found guilty, and that the verdict, after publication, could not, in an essential matter, be thus amended.

7th. That since the trial of this cause, the defendant, Green Martin, has learned from Richard L. Warthen, Esq., that on Sunday morning, the 14th March, 1858, in returning to Sandersville he met on the way Reuben Osborne, one of the jury in this case; that said Warthen enquired of said Osborne what was the verdict of the jury; and after expressing surprise at it it when told what it was, the said Osborne then said, in substance, by way of justification of it, that the beating of Peace by the Martins had an influence on the finding; thus showing that defendant had been greatly prejudiced by an affair for which he had been previously tried and acquitted, and had not had in this case, by reason of such influence, a fair and impartial trial.

And the counsel for Green Martin moved for a new trial on the additional ground of:

8th. Newly discovered evidence since the trial of said indictment, and which was utterly unknown to his counsel until since said trial; to-wit, the testimony of Doctor Nathan Tucker, of Laurens county, by whose affidavit, here shown to the Court, they expect, if a new trial be granted, to prove by him that Green Martin, for the two or three years last past, labored and still labors under a decided monomania; the special delusion being that his slaves entertained the idea of poisoning him, the said Green Martin, and were perseveringly endeavoring to carry it into effect, when there was no foundation or reason for such delusion.

And in support of the 7th and 8th grounds for new trial, offered the following affidavits, to-wit: The affidavit of Richard L. Warthen, Esq., as to the seventh ground, and that of Dr. Nathan Tucker, of Laurens county, and the joint af-

fidavit E. S. Langmade, Beverly D. Evans, Robert P. Harman, S. B. Jones and Iverson L. Harris, the counsel on the trial of the accused as to the eighth gronnd.

And the counter affidavit of Reuben Osborn, the juror, is also given.

*Copy of the Affidavit of Richard L. Warthen, Esq :*

Personally appeared before me Richard L. Warthen, Esq., who being duly sworn, saith that on Sunday last he met Reuben Osborn, one of the jurors who sat on the trial of Green Martin; that deponent asked him what verdict they had found; he replied that they had found guilty; deponent asked him if they had found him guilty of murder; the said Osborn answered yes. Deponent expressed some surprise at it, when the said juror remarked, in substance, by way of justification, that the beating of Peace by the Martins had an influence on the finding.

R. L. WARTHEN.

Sworn to in open Court 17th March, 1855.

L. A. JERNIGAN, Cl'k.

*Copy of the Affidavit of Reuben Osborn.*

GEORGIA, WASHINGTON COUNTY.

Personally appeared in open Court Reuben Osborn, who being duly sworn, deposeth and saith that he was one of the jurors who found the verdict against Green Martin, tried for murder at the present term of the Superior Court of said county; that said verdict, so far as his own conduct was concerned, was the result of the evidence in the case, and the law as given in charge by the Court; and as far as he knows, this was the case with the rest of the jurors who concurred in said verdict. He was not himself, and knows not that any other of said jurors, was influenced by the conduct of the Martins in the Peace case; that when Mr. R. L. Warthen asked deponent what the jury had done with Green Martin, he replied, we found him guilty. Mr. Warthen said it was

a bad case, and deponent replied, he is going to call for a new trial, I believe. But I didn't think worth while, according to the evidence in the case. Deponent further remarked then that they, meaning the Martins, must be bad men anyhow, for he had heard that they had beat a man pretty nigh to death last spring. But deponent did not mean to imply that the verdict was influenced by the Peace case at all, for he does not know or believe that any of the other jurors were influenced by it; for himself, he was sure he was not in making up a verdict against said Green Martin. The Peace case was mentioned in the jury room, and this deponent thinks he mentioned it. But he does not believe it had any effect on the verdict, and he is confident his own verdict was made up before he alluded to said case.

REUBEN OSBORN.

Sworn to and subscribed before me this March 19th, 1858
L. A. JERNIGAN, Cl'k.

GEORGIA, WASHINGTON COUNTY.

Personally appeared before me Mr. Edward S. Langmade, Beverly Evans, Robert Harman, S. B. Jones and Iverson L. Harris, who were the Attorneys at Law of Green Martin, and to whom solely the defence of Green Martin was confided, who stood charged by indictment with the murder of his negro boy Alfred, who being duly sworn, depose and say that they had no knowledge or information before or at the trial of said Martin, of the materiality of the testimony of Doctor Nathan Tucker, as shown by his affidavit, nor any intimation or conjecture of the said Green Martin having labored under any mental delusion at any time until since the trial, and that with all the diligence, and vigilance, and care which they severally employed as his attorneys since their respective employments in his behalf, they had not acquired any knowledge, or information, or intimation, which could or did lead them to look for ground of defence in the monomania of defendant until since the trial

of said Green Martin; and that had they have known or heard of the character of the testimony of Dr. Nathan Tucker, they would have placed the defence of their client upon the ground of mental delusion, and taken prompt steps to procure the testimony of said Tucker.

E. S. LANGMADE,

R. P. HARMAN,

B. D. EVANS,

S. B. JONES,

IVERSON L. HARRIS.

The foregoing affidavit was signed and sworn to before me this 18th March, 1858.

L. A. JERNIGAN, Cl'k.

GEORGIA, WASHINGTON COUNTY.

Before me personally came Nathan Tucker, who being duly sworn, deposeth and saith that deponent is a practicing physician, residing in the neighborhood of Green Martin, of said county, who, on an indictment for the murder of a boy named Alfred, the slave of the said Green, was tried and found guilty at the present term of the Superior Court of said county as this deponent has been informed and believes; that deponent has been for more than twenty years the family physician of the said Green Martin, holding frequent intercourse with him, and well acquainted with him; that until within a few years past the said Green Martin was in the enjoyment of good health, was a sober, orderly and peaceable man, a good citizen, a good neighbor, and by common repute, and in the opinion of this deponent, a kind and humane master; that some years since said Green Martin's health failed; that he became, and ever since has been laboring under a complication of diseases, to-wit, a chronic derangement of the liver and hydrocele, and has been under the treatment of this deponent. That one special effect of the diseased condition of said Green Martin, as before described, was to produce a longing for stimulants, a predispo-

sition to indulge in the use of ardent spirits; that under the influence of this morbid craving, said Green Martin has contracted the habit of drinking intemperately, and witness states distinctly it is his firm conviction that this habit has been superinduced by disease, and not the diseased condition, in which he is and has been, by intemperance. Deponent, as a doctor of medicine, expresses the opinion that the combined effect of disease and intemperance upon the said Martin has been to weaken, and in a good degree to derange the mind of said Martin; that deponent has had abundant evidence that he has, for two or three years, labored and still labors under a decided monomania, the special mental delusion being an abiding impression on his mind that his slaves entertained a design to poison him, and are perseveringly endeavoring to carry it into effect; and deponent has never been able to discover in the conduct and bearing of the said slaves the least foundation for such apprehension; believes it to be a mental delusion; that said Martin has long been keeping a strict watch upon his slaves—made frequent searches for poison, that he has several times brought to deponent substances found about the premises, and consulted deponent as to their properties, which deponent in every instance found to be free from poisonous qualities, and entirely harmless; that said Martin has been particularly suspicious of a female slave of his own, the mother of the boy Alfred, of whose murder he has been convicted; that under this impression, as this deponent has been creditably informed and believes, said Martin actually kept one of his female slaves in close confinement, though deponent did not actually see her in such confinement; deponent has been wholly unable, by any effort he could make, to divest the mind of said Martin of the delusion under which he was laboring. Deponent further gives it as his deliberate conviction that at the time the boy Alfred came to his death, and for some time previous and since, the said Martin was and has been insane on the subject of the fidelity of his slaves, their disposition

to take his life by poison, and his safety in their hands ; deponent never, for obvious reasons, communicated his opinion on this subject to said Martin or to his family, and does not believe it was known to said Martin or to his counsel at the time of his trial.

NATHAN TUCKER.

Sworn to and subscribed before me this 17th March, 1858.
JAMES F. SMITH, J. P.

After full argument of the grounds of new trial, his Honor the Judge overruled the motion for a new trial in this cause on all the grounds for the following reasons :

The three first because upon a careful review of the testimony, the facts sustain the verdict upon the plainest and clearest principles of law.

The 4th because the fact commented on by the counsel of the State was in evidence by two of the witnesses, and characterized by one of them as riding, and because the counsel for the State was not in conclusion, but might be answered and was answered by, counsel for the defendant who had the conclusion, and the testimony was that Godfry Martin sat in the saddle; it showed the defendant present, and that when the riding was over he ordered the boy to carry the saddle into the house.

The 5th because the Court did give the law in charge to the jury as it was asked for and in the very words of the authority cited, but only refused to give the law as applicable to particular facts, and gave it in charge as applicable to all the facts in evidence.

The 6th because it is not only the right, but the duty of the Court to direct the jury as to the regularity and form of their verdict, and to see that its own minutes and records clearly express what is done in the Court.

The 7th because upon reading the deposition of the juror Osborn, the Court believes him to be an upright and conscientious juror, and that in giving the verdict he was un-

biased and unprejudiced, and was governed solely by the law and the evidence.

The 8th because that the whole testimony showed that defendant was not acting under the alleged delusion, but was punishing his little slave for insolence.

To this decision of the Court the defendant, by his counsel, excepted.

JENKINS & HARRIS for the prisoner.

ATTORNEY GENERAL for the State.

*By the Court.*—LUMPKIN, J. delivering the opinion.

Green Martin having been convicted of murder at the March Term, 1858, of the Superior Court of Washington county, moved for a new trial, on eight grounds, as will appear in the Reporter's statement. The first three grounds may be considered together, namely, that the verdict was contrary to law, to the evidence and weight of evidence. The meaning of this is, that the facts in the record, did not justify the jury in finding the defendant guilty of murder. That if he was guilty of any offence, it was involuntary manslaughter.

This case is rather peculiar in several respects. No one doubts, that the boy Alfred came to his death at the hands of Green Martin and his son Godfrey, or one of them. At 12 o'clock on the 19th of May, 1857, he was well. The father and son commenced punishing him for some insolence offered to the son, which was kept up at longer or shorter intervals, until late in the afternoon, covering a period of three hours or more, when the boy expired. And the *post mortem* examination showed that the neck was dislocated, and that there were various bruises on the body and limbs of the boy. The last injury inflicted, as seen and testified to by one of the daughters of the defendant, was a

kick from Godfrey Martin, the son, which brought the boy to the ground, from which he was not seen to rise afterwards.

It is not disputed, that the owner of a slave has the right to correct him for his misconduct. And the mode and measure of punishment must in the main, be left to the master. It must not be cruel and excessive. The manner of punishing slaves, is different with different persons. The *unusual* modes of punishing slaves resorted to by some owners, are not necessarily, nor always the most cruel or severe. It is frequently so in the *seeming* only. From the nature of the case there cannot be any uniform rule prescribed upon the subject. It can hardly be supposed, that the Martin's intended to kill the boy. Still if the circumstances show, that their treatment was such, as was likely to produce death, the law will infer malice and the offence may be adjudged murder.

There is a further difficulty in this case. The dislocation of the neck was unquestionably sufficient of itself to cause instant death. It may have been occasioned by the last kick given by Godfrey Martin. The evidence is not full and satisfactory upon this point.

The proof discloses no positive participation on the part of Green Martin, after the first acts which were testified to, and these could not of themselves have produced death. And yet upon all of these points, there was room perhaps for the jury to have formed an opinion for themselves, touching all these matters. The points to which I have alluded, were involved in just that degree of uncertainty as to restrain a Court from pronouncing authoritatively, the law which should control this case. There were marks of abuse upon the person, particularly the limbs of the boy, as sworn to by Dr. Tucker, which are not explained or accounted for by the proof. Nor is the absence of testimony strange in this case. The daughters and sisters of the actors in this unfortunate affair, were the unwilling, not to say affrighted

witnesses, who alone were present all the time to its fatal termination.

As it is our purpose to remand this cause for a rehearing, we will forbear to comment upon the evidence.

4. As to the alleged misrepresentation of the testimony by the Attorney General, and the associate counsel on the side of the State, we have nothing to add, to what has been heretofore said by this Court. The recital of the testimony may not have been perhaps entirely accurate. The attention of the Court however, was not called to the impropriety complained of; and counsel for the prisoner had ample opportunity in conclusion to set the testimony right.

5. The next error assigned is, that the Court refused to give a legal charge when requested, and in the language of the request. There is some confusion in the record upon this point. The Judge certifies, that he gave the law as asked for, and in the very words of the authority relied on by the counsel. He refused to give the law in charge as applicable to a particular set of facts referred to by counsel, but did instruct the jury, that such was the law as applicable to all the facts of the case. And in this, we think the Judge was right. It is certainly true, that if Green Martin did not participate, so far as the particular facts recited in the request were concerned, he was not guilty, so far as those facts went to establish his guilt, still upon all the facts of the case, he might nevertheless, have been found guilty.

6. As to the complaint, that the Court allowed the verdict to be amended, we are clear, that it needed no amendment; but that it was a legal verdict and sufficiently certain as it was originally rendered.

7. Was Reuben Osborn an impartial juror?

If the statement made by him to Richard L. Warthen, that the previous misconduct of the Martins, had influenced the finding in this case, be true, even as to himself, of course he was not an indifferent, but a prejudiced juror. But try him by his own statement in the exculpatory affidavit which he

Martin vs. The State.

filed, and how does he stand? He admits that he said to Warthen in justification of the verdict of guilty which he and his fellow jurors had rendered, that the Martins were bad men *any how*, for that he had heard they had beat a man pretty nigh to death the spring before. But this is not all; he not only acknowledges the unfavorable impression made upon his own mind, as to the Martins, but confesses further, that the Peace case was mentioned in the room, while the jury were engaged in making up their verdict in this case, and he thinks, by himself. By way of explanation, I would remark, that Green Martin had been engaged in a difficulty with a man by the name of Peace, previous to this prosecution. Had not this juror a bias resting on his mind against the accused? We may suppose his own mind to be in doubt as to the guilt or innocence of the prisoner; his previous misconduct comes up to his recollection, and instead of giving to the defendant the benefit of his doubt, he concludes, "he is a bad man any how," let him be punished. And the inveteracy of his prejudice is clearly evinced, by his flinging the Peace case upon the minds of his fellow jurors, when they too, perhaps, were hesitating and halting between two opinions, as to what verdict they should return.

It is true, that Osborn endeavors to expurgate himself. *But we know not ourselves.* Besides, the affidavits of the other jurors were not taken exonerating themselves from the extrinsic influence which was brought to bear upon their minds during their consultation. If the statement be true, that Green Martin was not only acquitted, but fully justified by the Court and the country, for the severe chastisement inflicted by him on Peace, on account of the gross insult offered to the female members of Martin's family, it not only serves to illustrate the impropriety of lugging extraneous transactions into criminal trials, but it goes still further to fix the hostile state of Osborn's mind toward the man, whose life was committed to his hands.

On the ground of the disqualification of Osborn as a ju-

ror, we shall order a new trial in this case. Justice will not suffer by the delay. Courts generally should imitate the conduct of the Governor and Council of Massachusetts, when the life of Dr. Webster was in their keeping. (I am glad to find something to commend in that ancient commonwealth!) They took time to consider. They calmly and patiently examined every fact and circumstance, and finally, when nothing to extenuate could be found, the culprit was remitted to the dungeon and the gallows. And the whole country felt that the law had been vindicated, and the triumph of justice secured. There should be no hot haste, when the life of a fellow-citizen is involved.

8. As to the eighth ground, namely, the monomania of the defendant, we dispose of it by saying, that much more, we apprehend, will have to be proven, than is foreshadowed in the deposition of Dr. Tucker, before this defence can be made available.

Judgment reversed.